PEOPLE v. WEISS.

(Supreme Court, Appellate Division, Second Department. December 30, 1908.)

1. CRIMINAL LAW (§ 511*)—TESTIMONY OF ACCOMPLICE—CORROBORATION.
  The evidence which will corroborate the testimony of an accomplice essential to a conviction under Code Cr. Proc. § 399, providing that a conviction cannot be had on the testimony of an accomplice unless he is corroborated by such other evidence as tends to connect accused with the commission of the crime, must, independent of the evidence of the accomplice, and when taken by itself, lead to the inference, not only that a crime was committed, but that accused was implicated in it.
  [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1129; Dec. Dig. § 511.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. CRIMINAL LAW (§ 511*)—TESTIMONY OF ACCOMPLICE—CORROBORATION.

On a trial for larceny, evidence *held* to sufficiently corroborate the testimony of an accomplice, justifying a conviction.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1128; Dec. Dig. § 511.*]

3. CRIMINAL LAW (§ 423*)—DECLARATIONS OF CONSPIRATORS—ADMISSIBILITY AGAINST CO-CONSPIRATOR.

Where, on a trial for larceny, there was evidence that it had been agreed between defendant and a third person and others that, after they had obtained the money of the prosecutor, defendant was to hold it, and, if no complaint was made to the police, he was to keep a part of it and divide the balance equally among the others, proof that the third person while on his way to the station house after his arrest stated to the prosecutor that, if he would not make a complaint, the third person would get the money which he had passed to defendant, was admissible as proof of acts of a conspirator in the furtherance of the conspiracy.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 989; Dec. Dig. § 423.*]

4. WITNESSES (§ 350*)—IMPEACHMENT—PROOF OF CONVICTION OF CRIME.

Where a witness for the prosecution denied on cross-examination that he had ever been convicted of a felony, it was error to exclude a question as to whether he had ever been confined in a designated state prison.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 1141; Dec. Dig. § 350.*]

5. CRIMINAL LAW (§ 1170½*)—APPEAL—HARMLESS ERROR—ERRONEOUS EXCLUSION OF EVIDENCE.

Since, under the statute, the jury could not convict accused on the testimony of an accomplice unless corroborated, the refusal to permit the defense to discredit the accomplice by asking whether he had ever been confined in a designated state prison was not prejudicial.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 3133; Dec. Dig. § 1170½.*]

6. CRIMINAL LAW (§ 381*)—EVIDENCE OF CHARACTER—EFFECT.

While good character is not a defense to crime, it may be a defense to a criminal charge, and proof of good character alone, in the face of what would otherwise be conclusive proof of guilt, may create that reasonable doubt which entitles accused to an acquittal.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 846; Dec. Dig. § 381.*]

7. CRIMINAL LAW (§ 776*)—TRIAL—INSTRUCTIONS.

Where, on a trial for larceny, the prosecution relied on the testimony of an accomplice, barely sufficiently corroborated within the statute, and accused denied that he was implicated in the crime, and gave an account of his conduct corroborated by the testimony of a police officer, and gave evidence of good character, an instruction that good character was to be taken into consideration with all the other facts, and that, when a jury got in that condition that they were in doubt, the question of good character became important, that it may sway them to the side of innocence, was prejudicial error, necessitating a reversal.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1840–1842; Dec. Dig. § 776.*]

8. CRIMINAL LAW (§ 1056*)—APPEAL—OBJECTIONS IN TRIAL COURT—MANIFEST ERRORS.

A manifest error in an instruction which is prejudicial to accused will require reversal, though the instruction was given without exception.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 2668; Dec. Dig. § 1056.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from Kings County Court.

Julius Weiss was convicted of grand larceny, and he appeals. Reversed, and new trial ordered.

Argued before WOODWARD, JENKS, HOOKER, GAYNOR, and MILLER, JJ.

Thomas Kelby, for appellant.

Peter P. Smith, for the People.

MILLER, J. On Sunday, May 19, 1907, the complainant, Ruse, went to Coney Island and fell in with a stranger by the name of Colby, who invited Ruse into a billiard room, kept by the defendant on Oceanic Walk, to play pool. There the two met a third stranger by the name of Madden, and the three engaged in playing pool, as the result of which Ruse was persuaded that he had won $1,000, although he had refused to bet. Madden handed a roll of bills, purporting to be $1,000, to one Flynn, who pretended to be the manager of the place; and it was arranged that all three should meet at the same place the next morning, when Ruse was to get the money deposited with Flynn, provided he could satisfy the latter that he could have paid if he had lost. Accordingly, the four met the next morning at the billiard room, Ruse with a $1,000 bill to prove his ability to pay. There was difficulty over the counting of Madden's money, and a dispute arose over the genuineness of Ruse's bill, and the fairness of the game played the day before, during which Flynn managed to get the bill in his possession, and Ruse awakened to the fact that he was being victimized. A police officer, called either by Ruse or by the defendant (there is a dispute about it), arrested Flynn, and took him to the station house, where he was examined, and was found to have in his possession the sum of only $445. Two days later the defendant was arrested on the complaint of Ruse. The defendant was not present when the game was played on Sunday, but was in the billiard room during the occurrence on Monday. Flynn, who admitted his guilt, was called as a witness by the people. He testified that it was agreed between himself, the defendant, Colby, and Madden that, after they had obtained Ruse's money, the defendant was to hold it, and, if no complaint was made to the police, he was to keep 35 per cent. of it, and divide the balance equally among the three others. Flynn also testified that during the dispute with Ruse on Monday he, Flynn, passed the $1,000 bill to the defendant. The judgment is challenged on the ground (1) that there was not sufficient corroboration of the testimony of Flynn; (2) for alleged errors in rulings on evidence; (3) as being against the weight of evidence; and (4) for an error in the judge's charge.

1. Section 399 of the Code of Criminal Procedure provides:

"A conviction cannot be had upon the testimony of an accomplice, unless he be corroborated by such other evidence as tends to connect the defendant with the commission of the crime."

The rule is that:

"There should be some fact deposed to, independently altogether of the evidence of the accomplice, which, taken by itself, leads to the inference not only that a crime has been committed, but that the prisoner is implicated in

it." Roscoe's Crim. Ev. p. 122, cited in People v. O'Farrell, 175 N. Y. 325, 67 N. E. 588.

The corroborative evidence relied on in that case only showed opportunity. It must be admitted that such evidence in this case does not go much beyond that, but I think it does go a step further. Ruse's testimony established, if believed, the commission of the crime, and I think tended to show that the defendant was implicated in it. The fact that the defendant's billiard room was selected as the place to perpetrate such a crime is of itself suspicious, and some might think that the locality chosen tended to confirm that suspicion. But, of course, suspicion and conjecture cannot take the place of proof. While the testimony of the accomplice need not be corroborated in all its details and in respect to every element of the crime, it does not suffice that the corroboration merely relate to immaterial matters or succeed only in arousing suspicion. Ruse testified that on Sunday, when they started to play, they rapped for the manager, and Flynn responded to the call. It is not pretended that Flynn was employed as manager of the place. Indeed, the defendant testified that he only knew Flynn, as he had observed him occasionally hanging about the place. The defendant also testified that he was about the place on Sunday, but did not see Ruse there. Ruse testified in part respecting the transaction on Monday as follows:

"Flynn says, 'Let me take it'; and he snatched it out of my hand. He said: 'We will see if that is good or not.' I put up a fight for the money. I said: 'Give me back my money.' Flynn makes out the money was bad. He started to tangle the money up. He said: 'Well, we got to have the game played again. Just as he said that I noticed the man Weiss had come back to where we were standing. He said: 'I do not want any gambling in this place.' I told him that 'these man had stolen this $1,000 bill, and I want you to get it back if you got anything to do with this place.' He began to say this was no gambling place, but a billiard room, and I said: 'If you got anything to do with this place, I want you to make these men give me my money back.' He said: 'I do not want any gambling here.' That is all he would say. I said: 'I will have the house arrested.' I went to the door to see if I could see a policeman. He and Madden and Colby stood talking together while I went to the door, and I could not see any policeman, and I came back and we started a row about it again. I told Flynn I would have him arrested. At that time Weiss, Colby and Madden had sneaked out. They got out of sight."

Independently of the testimony of the accomplice, then, the evidence established or tended to establish that the $1,000 was stolen from Ruse by Flynn, Madden, and Colby in the defendant's billiard room; that the defendant was not present at the beginning of operations, but had left his place in the apparent management of one of the perpetrators of the crime, who, he says, was a hanger on; that the defendant was present when the money was actually stolen, and, when told of it immediately after, merely said that he did not want any gambling in his place; that, when Ruse started to call an officer, the defendant stood talking with two of the perpetrators of the crime, and then that the three immediately left the place. I think we should reject the characterization of Ruse that "they sneaked out," and that we must assume from a fair reading of the evidence that no force was used by Flynn in taking the money, although the complainant says

that "he snatched it." The evidence to which I have called attention, considered in connection with all of the circumstances, but wholly apart from the testimony of Flynn, does tend to show the complicity of the defendant in the crime. The jury might well say that his conduct when the money was actually stolen, as described by Ruse, was not that of an innocent man. If innocent, he would have been likely to have done what he says he did do, which I shall refer to later. Of course, this crime may have been committed in any billiard room. It was probably a fair inference from the dispute taking place that the men had been gambling, and an innocent man might have said and done what the defendant did; but the corroborative evidence need not negative every possible inference of innocence. It suffices if, on some material point, wholly apart from the testimony of the accomplice, it tends to connect the defendant with the commission of the crime.

2. Ruse was permitted to testify that on the way to the station house Flynn said to him that, if he would not make a complaint, he, Flynn, would send to his friends and get the money, that he passed the money to the manager of the place. The police officer was permitted to testify that Flynn said to Ruse at the station house that he, Flynn, would give Ruse a note to the manager of the billiard room to get the money. It was doubtless error to admit that evidence if the conspiracy terminated on Flynn's arrest. People v. Quinn, 123 App. Div. 682, 107 N. Y. Supp. 1101. It is true that, when the testimony of Ruse was admitted, the details of the conspiracy had not been sworn to by Flynn; but that relates only to the order of proof. In the discussion of this point we may consider that the necessary corroboration of Flynn's testimony was supplied, and that the conspiracy, as testified to by him, was established. That conspiracy had not terminated when Flynn was arrested. The defendant was to hold the money, evidently to satisfy the complainant, if he lodged a complaint. The money had not been divided. Flynn's proposition to send for the money was in accordance with the evident understanding of the conspirators. Said statements of Flynn were therefore acts of a co-conspirator in the furtherance of the conspiracy, or, at least, declarations accompanying and tending to characterize acts for which his co-conspirators were responsible, and as such could be proved against the defendant.

One other ruling on evidence needs to be noticed. The witness Flynn, after denying on cross-examination that he had ever been convicted of a felony, was asked: "Were you ever confined in Joliet State Prison?" The objection to that question was sustained. That ruling was doubtless wrong. Real v. People, 42 N. Y. 270. But the defendant could not have been harmed by not being permitted further to discredit a self-confessed thief. Independently of the statute, the jury would not have convicted on the testimony of Flynn unless they deemed it corroborated.

3. The defendant took the stand, and denied the story of Flynn in toto, and that he had any complicity at all in the crime or any acquaintance with the perpetrators, except as he had seen Flynn hanging around his place. He testified that, when informed by Ruse that the latter had lost $1,000, he went out on the sidewalk, looking for a police officer, and that, when one came along, he informed him that

there was a man inside who claimed to have lost $1,000, and advised him to go in and see about it. He was corroborated by the officer who made the arrest. Of course, the defendant might have said that for the purpose of disarming suspicion, expecting that, when the officer got in the place, Flynn would have disappeared as Madden and Colby succeeded in doing. But, if the officer's attention was called to the matter by the defendant in the expectation that that would result in the arrest of one of the participants in the crime, that fact would go far to show his innocence. It will thus be seen that the case was peculiarly one for the jury, who were to say what inferences were to be drawn from the defendant's conduct, considered in connection with all the surrounding circumstances. The defendant called five apparently reputable witnesses who testified that his reputation was good.

4. In charging the jury, the judge said:

"Good character is not a defense to a crime. It is to be taken into consideration with all the other facts that are before, and, when a jury get in that condition that they are in doubt, then that question of good character becomes important, that it may sway them to the side of innocence."

Obviously that is not a correct statement of the law. While good character is not a defense to crime, it may be a defense to a criminal charge; and that is doubtless what the jury understood the court to refer to. But, apart from that, the judge in effect told the jury that they could only consider the proof of good character in case they were in doubt; whereas, proof of good character alone in the face of what would otherwise be conclusive proof of guilt may create that reasonable doubt which entitles the defendant to an acquittal. A judgment of conviction was reversed for a charge in substance like this in People v. Friedland, 2 App. Div. 332, 37 N. Y. Supp. 974. Before making the erroneous statement above quoted, the judge had read to the jury an extract from the opinion of Judge Allen in Remsen v. People, 43 N. Y. 6, containing this sentence:

"There is no case in which the jury may not in the exercise of a sound judgment give a prisoner the benefit of a previous good character. No matter how conclusive the other testimony may appear to be, the character of the accused may be such as to create a doubt in the minds of the jury, and lead them to believe, in view of the improbabilities that a person of such character would be guilty of the offense charged, that the other evidence in the case is false, or the witnesses mistaken."

Doubtless the jury would have understood that quotation if it had not been limited or explained, but we must assume that the jury heeded the statement of the trial judge limiting and explaining its meaning. That statement was directly contrary to the quotation, and explicitly instructed the jury that the evidence of good character was limited in its effect to doubtful cases. Practically the jury were instructed that they could only consider such evidence in case it would be their duty to acquit without it. The evidence against the defendant consisted of the testimony of an alleged accomplice, a self-confessed thief, and the testimony of the complainant, which barely sufficed to supply the corroboration required by the statute. The defendant had denied that he was implicated in any way in the crime, and had given

an account of his conduct, corroborated by the testimony of the police officer, which, depending on the view the jury took of it, might have convinced ·the jury of his. innocence. In that situation the· evidence of good character might well have created a doubt where otherwise none would have existed. It might have led the jury to take the view of the defendant's conduct most favorable to him, and it might have led them to conclude that it was altogether unlikely that the defendant would have allowed himself to become implicated in such a transaction as the evidence disclosed. While no exception was taken to the charge, the error was so grave and its prejudicial character is so manifest that in the due administration of justice it cannot be overlooked, and we deem it our duty in the exercise of our discretion to order a new trial. See People v. Bonier, 179 N. Y. 315, 72 N. E. 226, 103 Am. St. Rep. 880; People v. Elliott, 163 N. Y. 11, 57 N. E. 103.

The judgment of conviction is reversed.

Judgment of the County Court of Kings County reversed, and new trial ordered. All concur.